IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DANNY LEROY BUTLER,**<br>　　　　　　**Plaintiff,**<br><br>　　　v.<br><br>**ARTIC GLACIER USA,**<br>　　　　　　**Defendant.** | CIVIL ACTION<br><br><br><br><br>NO. 15-3302 |

## MEMORANDUM OPINION

Plaintiff Danny Leroy Butler brings this case against his former employer, Defendant Arctic Glacier USA ("Arctic Glacier"), alleging that he was terminated for refusing to submit to a racially motivated drug test.[1] He has asserted claims for race discrimination in violation of 42 U.S.C. § 1981; Title VII Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 *et seq*. He has also asserted a state-law claim for wrongful termination.[2] Defendant has filed a motion for summary judgment on all of Plaintiff's claims. The motion shall be granted with respect to his claims under Title VII, section 1981, and the PHRA, and the Court shall decline to exercise supplemental jurisdiction over the claim for wrongful termination.

---

[1] The Court thanks counsel Wayne A. Ely and W. Charles Sipio of Kolman Ely PC for representing Plaintiff through the Court's Volunteer Employment Attorney Panel and for their excellent advocacy on Plaintiff's behalf.

[2] Plaintiff asserted a claim for invasion of privacy based on the drug test, which was dismissed in the Court's Order of February 1, 2016. (ECF No. 25). Plaintiff also asserted claims for age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the PHRA, which he withdrew in his brief in opposition to Defendant's motion for summary judgment. Pl.'s Br. at 2. Accordingly, Plaintiff's age discrimination claims shall be dismissed with prejudice.

1

I.   BACKGROUND

    A.   Plaintiff's Employment with the Arctic Glacier

Plaintiff was hired by Defendant in April 2007 as a Production Associate in Defendant's Twin Oaks, Pennsylvania facility. Joint Appendix ("J.A.") 11. Defendant is a manufacturer and distributor of ice products, and Plaintiff's job responsibilities included operating various ice production machinery, stacking bags of ice on pallets, and using a forklift to move pallets within the warehouse. J.A. 9-10. Since demand for ice is greater in the summer, most of the Production Associates at the Twin Oaks facility – including Plaintiff – were seasonally laid off each fall and re-applied for their positions each spring. J.A. 11. Each spring from 2008 until 2013, Plaintiff was re-hired following an interview with the manager of the Twin Oaks facility, John Stratman ("Stratman"). *Id.* At the conclusion of the 2014 peak ice season, Plaintiff continued working at the facility throughout the winter to complete various off-season maintenance projects, and he thus did not experience a seasonal layoff in 2013 and was not required to re-apply for his position in the spring of 2014. J.A. 20. Throughout his tenure at the facility, Plaintiff was consistently given excellent performance reviews. J.A. 16, 18-20, 67.

    B.   Drug Testing of Production Associates in 2014

In early July 2014, an individual identifying herself as the mother of Plaintiff's child called Defendant's workplace hotline to report "widespread" use and distribution of marijuana at the Twin Oaks facility, including the specific accusation that Plaintiff was using and selling marijuana at work. J.A. 66, 69. Vice President of the Northeast Region Andrew Gravener ("Gravener") decided to personally investigate the Twin Oaks facility in light of the report. J.A. 65.

To conduct the investigation, Gravener and Division Production Manager Bob Keen ("Keen") went to the Twin Oaks facility and joined Stratman for interviews with each Production Associate. J.A. 50.[3] Management employees were not investigated because, according to Gravener, there was no allegation that management was involved in the use or distribution of marijuana. J.A. 69.[4] During the meetings, the employees were asked about their knowledge of drug use at the facility, and at least three employees told Gravener during their interviews that Plaintiff was selling marijuana during his shift. *Id.* Each employee was also asked to take a drug test, but given the option to decline if they admitted to management that they could not pass a test that day. J.A. 50, 67. Plaintiff and Stratman both claim that Gravener offered employees who admitted they would fail the test two weeks to "get clean" before they would be asked again to take the test. J.A. 23, 50. Gravener denies that he offered employees a "grace period" (and has accused Stratman of lying about this fact), and maintains instead that the employees were given the option of admitting drug use only to avoid the expense and embarrassment of an inevitable positive test result. J.A. 67. All parties agree that Gravener did not specifically say that declining to take the test that day would result in termination. *Id.*

In his meeting with management, Plaintiff denied selling marijuana at work. J.A. 23.[5] He was then asked whether he could pass a drug test, to which he responded "No." *Id.* After several more questions regarding his knowledge of drug use at the facility, he was again asked if he could pass a urine test, and he again indicated that he could not. *Id.* Plaintiff testified that he

---

[3] The exact management personnel in each meeting varied, but Gravener was present for all but two of the meetings. J.A. 78-79.

[4] In total, 28 production employees were interviewed. J.A. 79. Of those, 6 were Caucasian, and the other 22 were either African-American, Hispanic, or otherwise not Caucasian. Def.'s Reply to Pl.'s Statement of Undisputed Material Facts ¶¶ 95-96. The record does not contain a comprehensive list of management employees or their races, although Gravener, Keen, and Stratman are all Caucasian. J.A. 50, 119.

[5] Gravener, Keen, and Stratman were present for the meeting with Plaintiff. J.A. 50.

was never asked to take a drug test, and thus also never refused a drug test. J.A. 22. At the end of the meeting, Plaintiff was told to leave the facility and that management would be in touch about "what it was going to do." J.A. 23.

A few days after the interviews, Keen informed Stratman that all of the employees who admitted that they could not pass a drug test would be fired, along with two employees who failed the test. J.A. 53. Stratman believes that this was a change from the original plan to give a two-week grace period, *id.*, but Gravener, who made the final decision to terminate the employees, testified that he had always planned to terminate any employees who admitted they could not pass the test. J.A. 67. In any case, Stratman informed Plaintiff that he was fired. J.A. 23. Plaintiff contends that Stratman told him that he was welcome to re-apply in 2015. *Id.* Stratman does not recall if he said this. J.A. 53.

In addition to Plaintiff, all of the other Production Associates who either admitted they could not pass a drug test or tested positive for drugs were fired as a result of the investigation. J.A. 28. Five of them (four African-American and one Caucasian) had admitted they could not pass a drug test. J.A. 78-79. The other two (one Hispanic and one African-American) tested positive for THC. *Id.* None of the terminated employees were replaced during the 2014 season; shifts were consolidated and the remaining employees worked overtime to account for the reduced labor force. J.A. 58.

### C. Plaintiff's Re-Application in 2015

In April 2015, Plaintiff applied to return to his seasonal Production Associate position. J.A. 28. He also applied for a driver position, even though he did not have a Commercial Driver's License ("CDL"), which is a requirement for the driver position. J.A. 5, 16. Stratman asked Keen if Plaintiff could be re-hired, and Keen replied that it was "not a good idea." J.A.

55.[6]  In the course of the conversation, Keen and Stratman discussed the admission of drug use the prior year and the fact that Plaintiff has been the employee originally accused of selling marijuana at the facility.  J.A. 55.  Following this discussion, Plaintiff was not re-hired.  *Id.*

In addition to Plaintiff, three of the other employees terminated after the 2014 investigation applied to return to the Twin Oaks facility in 2015.  J.A. 54.  Stratman did not consult with Keen or Gravener regarding these other re-applicants, and he chose to re-hire one of them, an African-American male older than Plaintiff who had admitted he would fail a drug test, but not to re-hire the other two – an African-American male who had admitted he would fail and a Hispanic male who had tested positive for THC.  *Id.*

## II.  LEGAL STANDARD

"[S]ummary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'"  *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (quoting Fed. R. Civ. P. 56(c)).  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof."  *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52).  Material facts are those which "might affect the outcome of the suit under the governing substantive law."  *Scheidemantle v.*

---

[6] Stratman was no longer the manager of the Twin Oaks facility in 2015, but he remained involved in the hiring process during the management transition.  J.A. 58.

*Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006).  In deciding a motion for summary judgment, "[t]he reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013).  However, to prevail on a motion for summary judgment, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-movant].'" *Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007) (quoting *Anderson*, 477 U.S. at 252) (alteration in *Jakimas*).  In other words, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Abington Friends Sch.*, 480 F.3d at 256 (citing *Celotex*, 477 U.S. at 322-26).  In making this showing of a genuine dispute, "the non-movant may not rest on speculation and conjecture in opposing a motion for summary judgment." *Ramara, Inc. v. Westfield Ins. Co.*, 814 F. 3d 660, 666 (3d Cir. 2016).

**III. DISCUSSION**

    **A. Race Discrimination**

Although Plaintiff has alleged race discrimination under three different statutes – Title VII, 42 U.S.C. § 1981, and the PHRA – the parties agree that the same legal analysis applies to race discrimination claims under all three laws.  *See Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009) ("[T]he substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII."); *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) ("[Pennsylvania courts] generally interpret the PHRA in accord with its federal counterparts.").  Title VII claims, like Plaintiff's, that are based on indirect evidence must be analyzed under the burden-shifting framework set out in *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792 (1973).[7]  Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).  If a *prima facie* case is established, the burden of production shifts to the defendant to present a legitimate, non-discriminatory reason for its actions.  *Id.*  If such a reason is proffered, the burden shifts back to the plaintiff to demonstrate pretext – that "the employer's proffered explanation was false, and that retaliation [or discrimination] was the real reason for the adverse employment action."  *Id.* (internal quotation marks omitted).  Although the burden of production of evidence shifts, "the plaintiff has the ultimate burden of persuasion at all times."  *Id.*

To establish a *prima facie* case of discrimination under Title VII, a plaintiff must show that he: (1) was a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and, (4) the circumstances of the adverse employment action imply discrimination.  *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir. 1999).  A plaintiff may support an inference of discrimination by showing that "similarly situated" employees who were not in a protected class were treated more favorably, *see Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013), but the employees identified to support this inference must be "similar in 'all relevant respects.'"  *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).  This standard is case-specific, but generally requires a "'showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's

---

[7] Plaintiff has conceded that there is no direct evidence of discrimination and that his claims rely on indirect evidence.  Pl.'s Br. at 3.

treatment of them.'" *Id.* at 223 (quoting *Radue v. Kimberly-Clark Corp.* 219 F.3d 612, 617-18 (7th Cir. 2000)).

Defendant does not dispute, for the purpose of this motion, that Plaintiff is a member of a protected class, that he was qualified for his position, and that he has identified three adverse actions: (1) a drug test,[8] (2) termination, and (3) rejection of his re-application for employment. Plaintiff's *prima facie* case thus turns on whether Plaintiff has identified evidence that support an inference of discrimination with respect to any of these three actions.

### 1. Drug Test

Plaintiff's primary argument in support of his race discrimination claim is that requiring only the production employees (who are primarily African-American and Hispanic), but not the management employees (who are allegedly Caucasian), to take a drug test suggests that the drug tests were motivated by racial bias. Defendant responds that there is insufficient information in the record regarding the racial disparity between production and management employees to support an inference that Plaintiff was treated differently based on his race.[9]

Setting aside whether Plaintiff's quasi-statistical evidence could support a disparate treatment claim under some circumstances, it is insufficient here for a reason unique to Plaintiff:

---

[8] Although the Third Circuit has yet to rule on whether requiring an employee to submit to a drug test can be an adverse action under some circumstances, other circuits have found that it can be. *See Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001-02 (7th Cir. 2000) ("[W]here a drug test is not performed in a routine fashion following the regular and legitimate practices of the employer, but is conducted in a manner that harasses or humiliates employees, requiring that the employee submit to the drug test as a condition of employment may be an adverse employment action."); *Landon v. Nw. Airlines, Inc.*, 72 F.3d 620, 624-25 (8th Cir. 1995) (holding that requiring employee to submit to drug test was an adverse action when there was no reasonable suspicion of drug use). For the purposes of this motion, Defendant has conceded that drug tests may be adverse actions. Def.'s Reply at 3.

[9] Defendant notes that Plaintiff's argument suggests a disparate impact claim. The Third Circuit has held that a disparate impact claim cannot be raised for the first time after the close of discovery unless the plaintiff amends his complaint to add the claim (which would require leave of the Court). *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 642 (3d Cir. 1993). The operative complaint in this case, the First Amended Complaint, does not contain any allegations to suggest a disparate impact claim (*i.e.*, of a facially neutral policy that has a disparate impact on a protected class), so Plaintiff cannot raise such a claim at this juncture. Plaintiff's discrimination claims must therefore be treated only as disparate treatment claims.

Defendant had independent information that he was selling and using drugs at work. There is nothing in the record to suggest that it had such information about any other employee. Thus, this inference does not apply to Plaintiff himself because he was not similarly situated to any other employee on the most relevant factor in this case: actual allegations of drug selling and use at work. Since Plaintiff has not identified any other employee who was specifically accused of drug use, but was not asked to take a drug test, nor has he cited other evidence to support an inference of discrimination surrounding his drug test, he has failed to establish a *prima facie* case of race discrimination with respect to the drug test.

### 2. Termination

At this juncture, Plaintiff does not appear to argue that his termination itself (as opposed to the drug test) was based on race discrimination. Even if he does maintain this argument, the circumstances surrounding the termination decision do not support an inference of discrimination. It is undisputed that Defendant fired all eight workers, regardless of race, who either failed a drug test or admitted during Gravener's investigation, that they would fail if one were administered. Thus, Plaintiff cannot point to a similarly situated employee (*i.e.*, one who admitted he would fail a drug test) who was treated more favorably, nor has he identified other evidence to suggest that the circumstances of his termination give rise to an inference of discrimination. He has thus failed to establish a *prima facie* case of discrimination with respect to his termination.

### 3. Failure to Re-Hire

Plaintiff has not presented a specific argument concerning Defendant's decision not to re-hire Plaintiff in spring 2015. Indeed, this claim is undermined by the fact that the only employee re-hired in 2015 after being fired as a result of the 2014 drug investigation was, like Plaintiff, an

9

African-American male. Given the lack of a specific argument to support this claim and that the only other employee who was re-hired was the same race as Plaintiff, Plaintiff has failed to make out a *prima facie* case of race discrimination arising from Defendant's decision not to re-hire him.

Since Plaintiff has failed to establish a *prima facie* case with respect to any of the alleged adverse actions in this case, Defendant's motion for summary judgment shall be granted with respect to Plaintiff's race discrimination claims under Title VII, section 1981, and the PHRA.

### B. Wrongful Discharge

The Court's jurisdiction over Plaintiff's claim for wrongful discharge is based on supplemental jurisdiction under 28 U.S.C. § 1367(a), which provides the Court with jurisdiction over state-law claims that "form part of the same case or controversy" as claims over which the Court has original jurisdiction. However, the Court may decline to exercise supplemental jurisdiction when it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Furthermore, "where the claim[s] over which the district court has original jurisdiction [are] dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995) (emphasis added).

In this case, none of Plaintiff's federal claims survive, so the Court may decline supplemental jurisdiction over Plaintiff's state-law wrongful discharge claim, and must do so under Third Circuit precedent unless considerations of judicial economy, convenience, and fairness affirmatively justify exercising jurisdiction. Neither party has identified any one of these factors that would be implicated by the Court's declining jurisdiction over this claim, nor

can the Court identify any reason that judicial economy or convenience would be served by continuing to exercise jurisdiction over this claim that implicates an evolving and complex issue of Pennsylvania law.  Accordingly, the Court shall decline to exercise supplemental jurisdiction over Plaintiff's wrongful discharge claim, and that claim shall be dismissed without prejudice.

An order follows.

Dated:  September 28, 2016

                                                                 **BY THE COURT:**

                                                                  **/S/WENDY BEETLESTONE, J.**

                                                                  _____

                                                                  **WENDY BEETLESTONE, J.**